Filed 9/6/16  P. v. Kennedy CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

DAMEYION TYSHON KENNEDY,

    Defendant and Appellant.

E063170

(Super.Ct.No. FVI902713)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Eric M. Nakata, Judge.  Affirmed in part; reversed in part.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

## INTRODUCTION[1]

A jury convicted defendant Dameyion Tyshon Kennedy of five offenses:  two counts of attempted murder of a police officer, evading a police officer, possession of a firearm by a felon, and street gang terrorism.[2]  The court sentenced defendant to a determinate sentence of 28 years eight months and an indeterminate sentence of 110 years to life in state prison.[3]

---

[1]  All statutory references are to the Penal Code unless stated otherwise.

[2]  The jury found defendant guilty of two counts of attempted murder of a police officer (counts 1 and 2, §§ 664 and 187, subd. (a)), evading a police officer (count 3, Veh. Code, § 2800.2, subd. (a)), possession of a firearm by a felon (count 4, § 12021, subd. (a)(l)), and street gang terrorism (count 5; § 186.22, subd. (a)).  The jury also found true that counts 1 and 2 were committed with the personal use of a firearm (§ 12022.53, subd. (b)) and the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)), counts 1 through 4 were committed for the benefit of a street gang (§ 186.22, subd. (b)), and counts 3 and 5 were committed with the personal use of a firearm (§ 12022.53, subd. (a)).

[3]  The trial court sustained the allegations that defendant had one prior strike conviction under section 667, subdivisions (b) through (i), and one prior conviction for a serious felony under section 667, subdivision (a).  The trial court sentenced appellant to a determinate sentence of 28 years eight months and an indeterminate sentence of 110 years to life in state prison:  15 years to life for each of counts 1 and 2 (attempted murder), doubled to 30 years under the Three Strikes Law, plus 20 years for the firearm enhancements for both counts, and five years for the serious prior for both counts; three years for count 3 (evading a police officer), doubled to six years under the Three Strikes Law, plus four years for the gang enhancement, 10 years for the firearm enhancement, and five years for the serious prior; eight months for count 4 (firearm possession), doubled to one year four months under the Three Strikes Law, plus one year for the gang enhancement; and eight months for count 5 (gang terrorism), doubled to one year four months under the Three Strikes Law.  The court stayed a four-year sentence for the firearm enhancement.

Defendant first contends there was insufficient evidence of the gang enhancements attached to counts 1 through 4 because: (1) two different gang names—Hoover Street Crips and Hoover Criminals—were identified; (2) the prosecution failed to show that one of the primary activities of the Hoover Criminals was one of the crimes specifically enumerated in section 186.2, subdivision (e); and (3) there was no support, other than the expert testimony, that the underlying offenses were gang-related. Defendant also argued the trial court abused its discretion in overruling the foundational objections that the gang expert lacked personal knowledge about the Hoover Criminals.

The remaining issues are: count 5, the street gang terrorism conviction, should be reversed because defendant acted alone (or the sentence should be stayed under section 654); the trial court erred in admitting defendant's gang admissions because defendant's *Miranda*[4] rights were not repeated during his booking; and the sentence for evading a police officer should be stayed under section 654.

We agree with the parties that the conviction for the street gang terrorism (count 5) should be reversed because defendant acted alone, and section 186.22, subdivision (a), requires him to have acted in concert with other gang members. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1128, 1132.) Otherwise, we affirm the judgment.

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

## II

## STATEMENT OF FACTS

In Victorville in 2009, defendant and Antoinette Pearson had an ongoing relationship and were the parents of a son. Pearson had another older son, Darnell, who was 17.

On the evening of December 10, 2009, defendant borrowed Pearson's car, a burgundy Mercury, to take Darnell to his friend Maurice's house to retrieve a video game. Maurice lived with his grandmother and his brothers. Maurice's uncle, Jeffrey Hughes, lived in the garage.

Hughes is an East Coast Crips gang member. Hughes has "EC" for "East Coast" tattooed on his chest and "ECBC" for "East Coast Block Crips" and "118th Street" tattooed on his arm. The Crips identifying color is blue.

On that night, defendant was wearing Crips gang colors—blue sweat pants, a blue shirt, and a blue cap. Darnell testified that, while they were driving to Maurice's house, defendant braked sharply for no apparent reason in front of a marked patrol car being driven by Deputy Sheriff Maria Gascon. The deputy activated her patrol unit's lights and signaled defendant to stop. Defendant pulled over, jumped out of the car, and told Darnell to drive away but Darnell did not do so.

Defendant and Gascon yelled at one another. Gascon ordered defendant to get back into his car. Defendant finally complied but immediately drove off, tires screeching. He pulled out a gun and tossed it to Darnell who used his shirt to grab the gun without touching it and tossed it back into defendant's lap.

4

Gascon called for backup and pursued defendant with lights and sirens activated. While traveling 50 or 60 mph, defendant told Darnell, "I'm going to start barking," which means shooting. Darnell warned, "Don't because she going to shoot back." Defendant continued to drive fast, braking hard numerous times and speeding. When they arrived at Maurice's house, Darnell jumped out of the moving car and ran inside the house.

Defendant continued driving until he finally pulled over and fired three shots at Gascon behind him. Gascon saw the flash from defendant's gun and ducked to her right. There was a bullet hole in the patrol car's windshield on the driver's side. Defendant drove off again and Gascon followed while defendant slammed on his brakes, made a U-turn, and drove directly at her. As defendant passed Gascon, he shot again and she returned fire, ducking as two bullets hit the side of the patrol car. When Gascon tried to follow defendant again, she lost him.

Defendant drove back to Maurice's residence, parked near the garage and knocked on Hughes's door. Defendant announced to Hughes, "I popped that bitch" and "I hope I hit that bitch." Defendant was rushed and angry and wanted to find Darnell and Maurice. Defendant asked Hughes if he could park the car in the garage to conceal it.

Inside the main house, defendant told Darnell, "Tell your mom I messed up. I shot at the police." When Hughes tried to move the car into the garage, he was unable to unlock the steering wheel. Because Hughes heard police cars, he got defendant to drive the car into the garage.

Defendant then took out his gun, slid the chamber back to eject the cartridge, and inserted the clip. Defendant asked Hughes where he could hide his gun. Defendant then used the bathroom and left.

Deputies came to the residence and found Pearson's car in the garage. Detective Kevin Warner searched the garage and found blue sweat pants, a beanie cap, CDs, and a do-rag. Inside the beanie cap were keys, including one for Pearson's car. Defendant's identification and a piece of mail addressed to him were inside the sweatpants pockets. One of the CDs had "BLACC" written on it with the "B" crossed out and "CC" instead of "CK".[5]

A short time later, a CHP officer apprehended defendant near Hughes's residence and near where the shootings had occurred. Defendant was wearing blue basketball shorts, a mostly blue shirt with a Mickey Mouse image, and white sneakers with orange detailing.

III

GANG EVIDENCE

After defendant's arrest, defendant admitted he had been a member of the 107th Street Hoover Crips gang, a subset of the Hoover Crips. Defendant had lived in the 107th Street Hoover Crips territory in Los Angeles. He had been jumped in at the age of 10 in 1986. He had a gang tattoo on his left shoulder that said "107%," meaning he was a

---

[5] The gang expert testified that the CD was gang-related because the rival gang, Bloods, are indicated by "B," and use "CK" to indicate "Crips Killer" so Crips avoid those letters.

Crips member of the 107th Street subset. His gang name was Demon. Defendant had moved to Rancho Cucamonga when he was in junior high. Defendant told the detective that the gang changed its name from Crips to Criminals in the early 1990s.

During the jail intake and booking interview which determines housing placement, Deputy Michael Jones interviewed defendant who "self-admitted" to being a member of the 107th Street Hoover Crips, and using the name "Little Demon." Defendant did not claim he was a dropout or an affiliate.

Deputy Tim Jackson, a gang expert, testified that he had received eight hours of gang training in 2006. He obtained ongoing experience with gangs while working at Glen Helen Rehabilitation Center. He then worked as Victorville police officer and had hundreds of gang contacts. He had 24 hours and two days of further gang instruction and was a member of the International Latino Gang Investigators Association. He had conducted 140 hours of independent gang research and was assigned to a federal gang impact task force, "cross-sworn" as a U.S. Marshall. He had testified 10 times as a gang expert. He has multiple gang contacts daily. He was familiar with the Hoover Criminals, or the Hoover Crips, and their crimes. He testified the Hoover Criminals and the Hoover Crips are the same gang with three subsets: the 7-4, the 52d Street or five deuce, and the 107th.

Jackson explained that, in the Victorville area, the gang members are less territorial than in Los Angeles and many gang members are transplanted from Los Angeles. New arrivals find other gang members, even possible rivals in Los Angeles, and associate with them or on their own, regardless of specific affiliation.

7

Jackson testified that the Hoover Street Crips disassociated from the Crips and changed their name to the Hoover Criminals or Crims in the 1990s. Their colors are blue and orange. Hoover Criminals wear blue with orange, often wearing Houston Astros baseball caps with an orange logo. Because defendant wore blue clothing and shoes with an orange stripe, defendant was identifying himself as a Hoover Criminals gang member.

Many Hoover Criminals still consider themselves Crips and call themselves Crips because 107 Street Hoover Criminals is a subset. The Hoover Criminals also can be rivals with Crips but it would not be unusual for different gang members to act together.

The process of leaving a gang includes removing or covering tattoos. Jackson explained that, if a gang dropout is incarcerated, he must be placed in protective custody to avoid being assaulted. Outside a jail setting, a member who dropped out would be assaulted on the street for failing to remove or cover up a gang tattoo.

Deputy Jackson testified that court records showed that defendant pleaded guilty to committing a crime in 1998 and admitted to a gang enhancement. Although defendant claimed during interrogation that he was a former member of the Hoover Street Crips, Deputy Jackson opined that defendant was an active Hoover Street Crip, as demonstrated by his gang clothing, his tattoos and his association with Hughes, a known East Coast Crips gang member, as well as other Crips members, and defendant's ongoing participation in criminal activity.

Deputy Jackson testified, based on certified court records, that the primary activities of the Hoover Criminals were narcotic sales, assault with a deadly weapon, theft, and burglary. He also testified about other Hoover Criminals or Crips who have

committed crimes for the benefit of the gang, including possession of narcotics for sale, possession of firearms, and attempted murder.

The prosecution asked Deputy Jackson whether the following hypothetical crime, based on the facts of the case, was committed for the benefit of, at the direction of, or in association with a gang: The defendant is a Crips member wearing gang colors who, when a police officer attempts to stop him, shoots at her and evades her, and seeks help from another Crips member to hide from the police. Based on this hypothetical, Deputy Jackson opined that the crimes benefited a criminal street gang because both the defendant and the gang would garner respect, fear, and intimidation from the attempt to shoot an officer.

Jackson explained that, by shooting at an officer, a gang member attains legendary status. Shooting at an officer is secondary only to killing an officer when it comes to respect and reputation, even more so than shooting a rival gang member. Law enforcement could be reluctant to act if a gang has a reputation for shooting officers. Jackson opined that the gang member in the hypothetical continued to participate in gang crime by fleeing to the home of a Crip and concealing the car and weapon. Defendant promoted the gang by engaging in a street crime, which would be noticed by other street gang members and would increase the viciousness of the gang's reputation. The parties stipulated that defendant had suffered three previous felony convictions.

IV

SUBSTANTIAL EVIDENCE OF GANG ENHANCEMENTS

Defendant contends insufficient evidence supports the gang enhancements attached to counts 1 through 4 because: (1) Deputy Jackson failed to establish a connection between defendant and the Hoover Criminals; (2) the prosecution failed to show that one of the primary activities of the Hoover Criminals was a crime specifically enumerated in section 186.2, subdivision (e); and (3) the only evidence the underlying offenses were gang-related was Deputy Jackson's testimony. The appellate court reviews a jury's true finding on the gang enhancement under section 186.22 for substantial evidence. (*People v. Williams* (2009) 170 Cal.App.4th 587, 624.)

In spite of the name change from Hoover Street Crips to Hoover Criminals, we conclude substantial evidence supported the true findings of the gang enhancements. A true finding of a gang enhancement allegation under section 186.22, subdivision (b)(l), requires proof that the charged offense was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(l), and former subd. (c).) In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "'pattern of criminal gang activity'" by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called

10

"predicate offenses") during the statutorily defined period.  (§ 186.22, subds. (e) and (f).)  (*People v. Gardeley* (1996) 14 Cal.4th 605, 616-617, disapproved on other grounds "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.)

Defendant must have the "'specific intent to promote, further, or assist in any criminal conduct by gang members. . . .'" (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)  Proof of specific intent to promote or assist criminal gang conduct must usually be inferred from facts and circumstances surrounding the offense.  (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

On his first point, defendant argues that Deputy Jackson failed to establish a connection between defendant and a specific gang.  The California Supreme Court, in *People v. Prunty* (2015) 62 Cal.4th 59, 67, held that the prosecution is required "to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang.  The prosecution has significant discretion in how it proves this associational or organizational connection to exist."  In this case, the prosecution had to present evidence that defendant evaded the officer and shot at her with the specific intent to promote, further, or assist any criminal conduct by gang members.  Although defendant admitted he was a Hoover Street Crip, actual gang membership was not required.  However, gang membership does show an intent to benefit a gang.  (*People v. Sanchez, supra,* 63 Cal.4th at p. 698, citing *People v. Valdez* (2012) 55 Cal.4th 82, 132.)  As the California Supreme Court has explained, "the scienter requirement in

11

section l86.22(b)(1)—i.e., 'the specific intent to promote, further, or assist in *any* criminal conduct by gang members'—is unambiguous and applies to any criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*People v. Albillar* (2010) 51 Cal.4th 47, 66.)

The California Supreme Court in *People v. Prunty, supra*, 62 Cal.4th at pages 80-81, held that the "'sameness' requirement means that the prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same." In relying on *Prunty*'s "sameness" requirement, defendant contends the gang established by the prosecution was not the same gang that the defendant sought to benefit. He contends that the expert testified about the existence of the Hoover Criminals but the prosecution argued defendant was attempting to benefit the Hoover Street Crips, not the Hoover Criminals. However, although the Hoover Street Crips had changed their name to the Hoover Criminals, many members still wore blue and considered themselves Hoover Street Crips.

Deputy Jackson testified that the Hoover Street Crips was a criminal street gang of which defendant considered himself a member. Furthermore, defendant admitted he was a member of the Hoover Street Crips, was wearing Hoover Street Crips gang colors, had Hoover Street Crips gang tattoos, and engaged in the ultimate gang crime of shooting an officer, which he later bragged about to a Crips gangbanger. The names are interchangeable, and do not denote different gangs. Therefore, the evidence established

12

that defendant was connected to the Hoover Street Crips regardless of the fact that the gang had changed its name to Hoover Criminals.

The Hoover Criminals gang had established a pattern of criminal behavior in both Los Angeles and in the high desert where defendant lived. Jackson testified that defendant was still an active Hoover Street Crips member, relying on defendant's admission during booking, the color of his clothing, and his tattoos, and his ongoing association with other gang members. *Prunty* explains the prosecution need not demonstrate the precise scope of an alleged gang, but it must allow the jury to reasonably infer that defendant's "criminal street gang" included the "group" that committed the primary activities and predicate offenses. (*Prunty, supra*, 62 Cal.4th at p. 76.) Based on the evidence, the jury could reasonably find that the Hoover Criminals and Hoover Street Crips were one and the same gang that defendant sought to benefit and was the group that committed the primary activities and the predicate offenses.

We hold sufficient evidence showed that the primary activities of the Hoover gang was the commission of the crimes enumerated in section 186.22, subdivision (e). Deputy Jackson also testified about predicate offenses committed by the Hoover Criminals. Jackson's testimony, based on reliable sources, was that the primary purpose of the Hoover Criminals was to commit crimes of theft, burglary, narcotics sales, assault with a deadly weapon, and other violent crimes. (§ 186.22, subd. (e), subsections (1), (4), and (11).) The prosecution was not required to prove that the Hoover gang engaged in all of the crimes contained in the jury instruction, only one or more of the crimes enumerated in the statute.

13

Appellant relies on *In re Alexander L.* (2007) 149 Cal.App.4th 605 to support his contention that Deputy Jackson's testimony lacked foundation. The gang expert in that case said, "'I know [the gang has] committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations." (*Id.* at p. 611.) The court held that the expert's testimony lacked adequate foundation and, therefore, the evidence was insufficient: "We cannot know whether the basis of Lang's testimony on this point was reliable, because information establishing reliability was never elicited from him at trial. It is impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Id.* at p. 612.)

Here, by contrast, Deputy Jackson supplied the necessary foundation for his testimony. He testified that he learned his information about gangs from his daily personal contact with gangs. He testified that he learned the remainder of his information about the Hoover gang from Los Angeles gang experts, as well as from gang intelligence and by driving around the area. He testified that he learned that the Hoover gang had established a pattern of criminal activity in both Los Angeles and the high desert and he saw what crimes the Hoover gang had committed. He testified that he personally contacted Hoover gang members frequently in the high desert. He had recently made contact with a Hoover Criminal in Victorville who was distributing narcotics.

As already discussed, Jackson testified that he knew that the Hoover Criminals had specifically committed two of the primary activities contained in section 186.22,

subdivision (e); narcotic sales and assault with a deadly weapon, along with some violent crimes. Accordingly, Deputy Jackson's testimony constituted sufficient evidence to prove that the Hoover Criminals, and the Hoover Street Crips, was a "criminal street gang" under section 186.22, subdivision (f).

Jackson's expert testimony was also supported by the nature of defendant's crime of shooting at an officer, his gang-style clothing, and his boasting about the crime to Hughes while seeking help from him. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 662.)

Furthermore, Jackson's expert testimony was based on "personal observations of and discussions with gang members as well as information from other officers and the department's files." (*People v. Gamez* (1991) 235 Cal.App.3d 957, 966.) Expert testimony may be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. (Evid. Code, § 801, subd. (b); *People v. Sanchez, supra,* 63 Cal.4th at pp. 678-679.) So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily inadmissible can form the proper basis for an expert's opinion testimony. (*In re Fields* (1990) 51 Cal.3d 1063, 1070 [expert witness can base "opinion on reliable hearsay, including out-of-court declarations of other persons."].)

Deputy Jackson testified that he had been assigned to the Victorville City gang unit where his duties included gang suppression, gang investigation follow-up, patrol in gang areas and anything else gang related. He attended several courses on gangs and interacted with hundreds of gang members, learning about gang subculture, ranking

15

structures, taxing structures and repercussions when gang members fail to comply, as well as patterns of criminal activity, gang tattoos, hand signs, colors, and gang territories. He also conducted his own research on gang culture. His gang studies included Los Angeles gangs. Accordingly, because Deputy Jackson's testimony was based on reliable sources, personal observations, training, research and other gang experts, the court could find his testimony was admissible even if defendant challenges the validity of his testimony about individual gang members.

Finally, Deputy Jackson's general gang testimony about gang culture and practices is not inadmissible: "It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation." (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.) The subject matter of the culture and habits of criminal street gangs meets Evidence Code section 801 criteria. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370 ["The use of expert testimony in the area of gang sociology and psychology is well established."].) Relying on information from discussions with gang members as well as information from other officers and the department's files is sufficient foundation. (*Ibid.*) Deputy Jackson's testimony about the process for leaving a gang was properly admitted. (*People v. Gardeley, supra*, 14 Cal.4th at p. 618.)

The trial court did not abuse its discretion in overruling the foundation objections regarding Deputy Jackson's expert testimony. His experience working in the gang unit for six years coupled with the information from the training he received and his personal observations, gave him knowledge about the workings of criminal street gangs that was "beyond common experience" and assisted the jury in understanding the culture and

16

activities of criminal street gangs and their members, including the Hoover Criminals. (Evid. Code, § 801, subd. (a).) Defendant has not shown the court abused its discretion in permitting Deputy Jackson's testimony as an expert on criminal street gangs in general or the Hoover Criminals in particular.

V

DEFENDANT'S GANG ADMISSIONS

Defendant next argues his *Miranda* rights should have been repeated to him during his booking. However, because he had already been given his rights, the trial court properly found that his responses to the booking questions were admissible as evidence of his gang affiliation. (*People v. Elizalde* (2015) 61 Cal.4th 523, 527.)

After defendant was arrested he was read and waived his *Miranda* rights at around 3:00 a.m. He was questioned until he took a polygraph test at approximately 6:00 a.m. and questioned again until around 8:40 a.m. Another detective questioned him until approximately 2:20 p.m. At 4:16 p.m., the booking deputy Jones spoke to defendant about his gang affiliation for purposes of housing placement. Defendant told Jones he was a member of the 107th Street Hoover Crips and called "Lil Demon" and he did not claim that he was a drop out or an affiliate. The next day, defendant acknowledged he had received and understood his *Miranda* rights. Therefore, defendant was properly read his rights before being interrogated and that warning equally applied to the booking questions.

The California Supreme Court in *People v. Elizalde, supra*, 61 Cal.4th at page 527, held that the *Miranda* rule applies to booking questions regarding gang affiliation

17

which are reasonably likely to elicit similar incriminating information as regular interrogations. Defendant maintains that the booking questionnaire was substantially different than the previous interrogations because it was in written form and happened in a different environment, requiring his rights be repeated. We reject this argument. The *Elizalde* court did not hold that booking questions require repeated *Miranda* warnings but rather held that booking questions are on par with interrogation questions. (*Ibid.*) No repetition is required. A gang member who has been arrested, read his *Miranda* rights, interrogated and submitted to a polygraph test cannot assume that the preceding *Miranda* advisement did not apply to the gang affiliation questions and questionnaire: "'[R]eadvisement is unnecessary where the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.'" (*People v. Pearson* (2012) 53 Cal.4th 306, 316-317.) In *Pearson*, the court held that the interview was reasonably contemporaneous with the defendant's *Miranda* waiver, which had been provided 27 hours before the interview took place, while he remained in custody and nothing in the record showed defendant had forgotten or no longer understood his rights.

Defendant was read his rights only 13 hours before his booking and he was continuously in custody. He understood and waived his rights. The next day, after he was reminded of his rights, he continued to cooperate with the officers. Considering the totality of the circumstances, we conclude defendant participated in the booking interview, knowing his rights. The admission of his booking answers did not violate his Fifth and Fourteenth Amendment rights.

18

Furthermore, any error was harmless, as other evidence convincingly established his gang membership: "Because [defendant's] gang affiliation was amply established by independent and uncontradicted evidence, the erroneous admission of his challenged statements was harmless beyond a reasonable doubt." (*People v. Elizalde, supra*, 61 Cal.4th at p. 542.) Defendant's tattoos, his clothing, his boasting, and his prior conviction with a gang enhancement, showed beyond a reasonable doubt that the jury would have reached the same conclusions without the evidence of appellant's answers to the booking questions.

## VI

## SECTION 654

Defendant contends that his sentence for evading a police officer (count 3) should have been stayed relative to his sentences for attempted murder (counts 1 and 2) under section 654.[6] He contends his evading offense was inextricably linked with his murder attempts because he shot at Gascon while she was pursuing him. We disagree. Defendant committed multiple acts of evading and shooting with multiple intents and objectives to flee and to kill. Section 654 did not apply to his sentence on count 3.

Section 654 prohibits multiple punishment where a single criminal act or omission violates more than one penal statute. This statutory prohibition has been extended to cases in which an indivisible course of conduct with a single objective violates several

---

[6] Section 654, subdivision (a), provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

19

different penal statutes: "If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.]" (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525; see *Neal v. State of California* (1960) 55 Cal.2d 11, 19.) Section 654 does not apply to similar but consecutive and different objectives, or to simultaneous but separate objectives. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211-1212.) It is the defendant's intent and objective that determines whether the course of conduct is indivisible. (*People v. Le* (2006) 136 Cal.App.4th 925, 931.)

"The trial court has broad latitude in determining whether section 654, subdivision (a) applies in a given case." (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1564.) The absence of an express finding from a trial court concerning the potential applicability of section 654 does not mandate reversal on appeal. Rather, the court reviews the trial court's implicit determination that section 654 does not apply, and determines whether there is substantial evidence to support the trial court's finding. (See *People v. Osband* (1996) 13 Cal.4th 622, 730-731; *People v. Andra* (2007) 156 Cal.App.4th 638, 640.) A trial court's factual finding, whether implicit or explicit, is reviewed in the light most favorable to the prevailing party, presuming the existence of every fact the factfinder could reasonably deduce from the evidence. (*People v. Tarris* (2009) 180 Cal.App.4th 612, 627.)

Defendant alternately intended to evade Gascon and kill her. It was reasonable for the court to find defendant had separate intents and objectives. Defendant first evaded Deputy Gascon but then he pulled over and began shooting. When defendant continued fleeing and Deputy Gascon followed again, he slammed on his brakes, made a U-turn and drove directly at Deputy Gascon. While passing, he shot at her again, bullets hitting the side of her vehicle. Thus, substantial evidence supported the trial court's implied finding that defendant had two distinct acts and two distinct intents. Defendant's dangerous driving demonstrated the "wanton disregard for safety" as an element of the evading charge. Because the evidence showed defendant was both intending to evade and trying to kill Deputy Gascon, the evidence was sufficient to support the court's implied finding that defendant had two objectives. Accordingly, the trial court was not required to stay defendant's sentence on count 3 under section 654.

## VII

## DISPOSITON

We reverse count 5 and otherwise affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.